36 Mass. App. Ct. 411     411

Miller v. Risk Management Foundation of the Harvard Medical Institutions, Inc.

MARY MILLER, administratrix,[1] vs. RISK MANAGEMENT
FOUNDATION OF THE HARVARD MEDICAL INSTITUTIONS,
INC. (and a companion case[2]).

No. 92-P-1127.

Norfolk. November 8, 1993. - April 29, 1994.

Present: PERRETTA, KAPLAN, & FINE, JJ.

*Consumer Protection Act*, Availability of remedy, Insurance, Trade or
commerce, Offer of settlement, Unfair act or practice, Damages, Attor-
ney's fees, Interest. *Insurance*, Unfair act or practice. *Damages*, Con-
sumer protection case, Interest, Attorney's fees. *Interest*. *Words*,
"Trade," "Commerce."

A risk management corporation acting as a "facilitator" in handling medi-
cal malpractice claims against certain affiliated hospitals, was engaged
in "trade or commerce" within the meaning of G. L. c. 93A, where its
activities were motivated by business reasons and carried out in a busi-
ness context. [415-417]
Standards of unfair claim settlement practices set forth in G. L. c. 176D,
§ 3(9), were properly considered by the judge in an action under G. L.
c. 93A brought by an injured patient against a hospital's "claims
facilitator" for its failure to effectuate a fair settlement of the patient's
claims and its refusal to pay the claims without conducting a reasona-
ble investigation. [417-418]
The record of an action brought under G. L. c. 93A against a hospital's
"claims facilitator" warranted the judge's conclusions that the defend-
ant failed to act in good faith to settle a certain malpractice claim after
liability was reasonably clear in violation of G. L. c. 93A, § 2, and that
the defendant had acted in bad faith with reason to know that it was in
violation of § 2, so as to warrant the trebling of damages. [418-420]
In an action brought under G. L. c. 93A, the matter of damages was re-
manded for recalculation in light of prejudgment interest awarded in an
underlying action [420]; the matter of attorney's fees in the underlying
action awarded as damages was remanded for recalculation to account
for expenses and disbursements but not the contingent fee [421]; and

---

[1]The original plaintiff, Malcolm Miller, died pending the action, and his
wife, Mary, was substituted as administratrix of the estate.
[2]Mary Miller vs. Risk Management Foundation of the Harvard Medical
Institutions, Inc.

the matter of attorney's fees in the main action was remanded for reconsideration [422-423].


CIVIL ACTIONS commenced in the Superior Court Department on February 15, 1985, and August 29, 1986, respectively.

The cases were heard by *Barbara J. Rouse*, J.

*Stephen J. Paris* for the defendant.

*William F. Looney, Jr.*, for the plaintiff.

KAPLAN, J. 1. *Summary.* Malcolm Miller, a patient at Beth Israel Hospital in Boston, was injured through the probable negligence of the hospital and the possible negligence of a doctor and nurse.

Risk Management Foundation of the Harvard Medical Institutions, Inc. (Risk Management), acts as a "facilitator" in handling malpractice claims against Beth Israel and other Harvard related hospitals. Over a period of time the company made no move to effect a settlement of Miller's case. Accordingly, the Millers, husband and wife, brought a malpractice action in Superior Court against the hospital and the doctor and nurse. The action succeeded against the hospital, but the two substantial verdicts against it were each reduced to the statutory maximum of $20,000 allowed against a charitable institution for its tortious conduct. No appeal was taken.

The present actions were brought by the Millers against Risk Management under the Consumer Protection Act, G. L. c. 93A, § 9, and the statute regarding unfair acts and practices in the business of insurance, G. L. c. 176D, based upon the failure of the company to make a reasonable offer of settlement, even after formal demand under c. 93A, although liability of the hospital, at least, appeared plain. Upon a consolidated nonjury trial, a judge of the Superior Court awarded treble damages to the Millers under c. 93A for the delay in their recovery and also allowed attorney's fees (and costs) for legal work on behalf of the Millers done

36 Mass. App. Ct. 411                                      413

Miller *v.* Risk Management Foundation of the Harvard Medical Institutions, Inc.

in the present actions and the earlier malpractice suit. The c. 176D claims were dismissed.[3]

Risk Management appeals.[4] We affirm the judgments except as to a feature of the award of damages for the delay and certain aspects of the allowance of attorney's fees. The trial court is to reconsider these matters on remand.

2. *The lawsuits.* Malcolm Miller, seventy years of age at the time, underwent a coronary artery triple bypass at the Beth Israel Hospital early in April, 1983. A surgical procedure followed on April 9, 1983, to remove an intraaortic balloon pump from his left thigh. Through error, a high intensity heat lamp rather than an operating lamp was brought into Miller's room and used, with the result that Miller suffered second and third degree burns. Present in the room were at least one doctor, Dr. Eric Hanson, and a nurse, Patricia Cady. The injuries were painful and serious; to graft skin over the burned area required two operations with additional hospitalizations.

Risk Management received notice of the incident on April 14, 1983. Three months later, on July 14, 1983, the company assigned the claim to a claims investigator, John J. Doyle, Jr. Doyle prepared a "15 day report" on July 22, 1983, which stated that liability was "probable" and that among Doyle's "future plans" was "settle." Doyle's "60 day report" had a brief recap of the incident, indicating that an employee had mistakenly failed to take a lamp from the operating room and placed a heat lamp in Miller's room instead. Doctors and nurses might be involved for omitting to check. Doyle wrote that he should try to settle with Miller's attorney.

In June, 1983, the Millers retained Mr. Daniel Hourihan to represent them. There were minor contacts between Doyle and Hourihan over the next months but nothing significant until June 28, 1984, when Hourihan accompanied a packet of medical records and bills with a letter to Doyle making an

---

[3]But as to the bearing of the standards of c. 176D on the application of c. 93A, see our point 4 below.

[4]There is also a cross appeal by the Millers, dealt with at note 17 below and related text.

over-all settlement offer of $169,000. On August 8, 1984, Hourihan wrote asking for a response to his earlier letter.

In September, 1984, Doyle went to the Millers' house to view Miller's scars. Doyle did not speak to Hanson, Cady, or other persons at the hospital; nor did he propose any settlement to Hourihan.

Hourihan filed a malpractice action on Miller's behalf on November 21, 1984 (a consortium claim on behalf of the wife was later added). The amended complaint named Beth Israel, Hanson, and Cady as defendants.

On November 23 and 27, 1984, Hourihan sent Risk Management c. 93A demand letters stating that suit would be brought against the company under the statute if a fair and equitable settlement of the malpractice action was not forthcoming within thirty days.[5] Doyle responded on December 18, 1984, that because of Miller's prior medical condition, he (Doyle) was "find[ing] it extremely difficult" to evaluate Miller's negligence claim; he requested more information "to shed light upon the alleged" liability. On April 10, 1985, Risk Management offered $20,000 in full settlement of both plaintiffs' claims. The offer was refused.

Trial to a jury of the malpractice action took place in June and July, 1986.[6] Miller and his wife achieved verdicts against the hospital of, respectively, $278,000 and $130,000, but each was reduced to $20,000 in principal amount pursuant to G. L. c. 231, § 85K, which limits a tort recovery against a charitable institution to that sum (see partial text at note 9 below). Verdicts were returned for Dr. Hanson and Cady and against the Millers. There was no appeal from the judgments of July 10, 1986.

On February 15, 1985, Malcolm Miller commenced the present action against Risk Management (his wife later also filed an action). The gravamen was that Risk Management

---

[5]About this time, on November 27, 1984, John Coughlin, Doyle's superior, noted in the claim file that "[f]ile reflects neglect" by Doyle.

[6]In the course of the trial, Risk Management offered to settle the whole action for $35,000. The Millers' attorney said he would take that as a settlement of the claim against the hospital only. That counteroffer was rejected.

36 Mass. App. Ct. 411                                    415

Miller v. Risk Management Foundation of the Harvard Medical Institutions, Inc.

had wrongfully withheld settlement of the Millers' claims when liability was reasonably plain. After nonjury trial in April and May, 1989, the judge (not the judge who tried the malpractice case) made findings and rulings and ordered judgment for Risk Management on the c. 176D claim and for the Millers on the c. 93A claim. The judge found that Risk Management was not in the business of insurance and therefore not the object of a direct action under c. 176D.[7] However, the court found that Risk Management's role in handling claims against the hospitals made it subject to c. 93A and that it had violated the statute in dealing with the Millers. Upon decision of motions for amendments of the findings and rulings, and submissions and argument regarding attorney's fees, judgments entered for the Millers for treble the interest at a rate of six percent on the $40,000 from the date liability was reasonably clear for the malpractice (July 1983) until judgment thereon (July 1986), a total of $21,600; also for attorney's fees in amounts the judge found fair in respect to each lawsuit: $30,547.31, as against $45,593.00 requested (plus $1,276.55 costs) for the malpractice action, and $70,000, as against $146,496.75 requested (plus $12,152.51 costs) for the c. 93A actions.[8]

In response to Risk Management's contentions, we consider whether the company is amenable to c. 93A; whether, in applying that statute, reference may be made to the standards of c. 176D; whether violations were properly found; and whether damages and attorneys' fees were correctly adjudged.

3. *Amenability of Risk Management to c. 93A.* Section 2(a) of c. 93A, as inserted by St. 1967, c. 813, § 1, declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." Risk Management denies that it engages in "trade" or "commerce," but the judge's finding in the affirmative appears sound.

[7]The Millers do not challenge this ruling on the present appeal.

[8]Mr. Hourihan initiated the c. 93A action and was succeeded by Mr. William Looney, who received $60,000 of the fee awarded.

In reaching for the right characterization, "[f]actors to be considered include the character of the party, the nature of the transaction, the activities engaged in by the party, and whether the transaction was motivated by business or personal reasons." *Barrett* v. *Massachusetts Insurers Insolvency Fund*, 412 Mass. 774, 775-776 (1992). See also *Begelfer* v. *Najarian*, 381 Mass. 177, 190-191 (1980).

The record shows that medical malpractice insurance for Beth Israel Hospital and other Harvard affiliated hospitals and certain of their respective staffs is provided by Controlled Risk Insurance Company (CRICO), an entity organized in the Cayman Islands. Risk Management, incorporated as a Massachusetts charitable corporation, has been engaged in investigating claims asserted against the hospitals, negotiating settlements as appropriate, and appointing trial attorneys when claims proceed to litigation. Both CRICO and Risk Management are owned by Harvard University and the affiliated hospitals.

As the judge found, Risk Management was "engaged in the business of claim facilitation," i.e., in seeking to control or minimize the ultimate exposure of CRICO and thus of the hospitals. Such activity, the judge wrote, "was motivated by business and not personal reasons and was primarily commercial in character." The work was "done in a 'business context' which makes it part of trade or commerce within the meaning of G. L. c. 93A" (citing *Lantner* v. *Carson*, 374 Mass. 606, 611 [1978]). True, the company did not render services to the Millers for consideration, the kind of connection usually presented in c. 93A litigation, but the commercial relation was there as the company was in arms-length negotiation with the Millers over their malpractice demand.

Risk Management offers particular objections, but in our view they fail. That the company is nominally a charitable organization, working in support of veritable charitable institutions, does not allow it an escape from c. 93A where, as here, it has in fact performed in a business way. This is clear from *Planned Parenthood Fedn. of America, Inc.* v. *Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480, 492-493

36 Mass. App. Ct. 411 417

Miller v. Risk Management Foundation of the Harvard Medical Institutions, Inc.

(1986).[9] The company derives no comfort from *All Seasons Servs., Inc.* v. *Commissioner of Health & Hosps. of Boston*, 416 Mass. 269, 271-272 (1993). When Boston City Hospital, operated by the board of health and hospitals of the city of Boston, let out a contract for food services on its premises, that was "merely incidental" to the hospital's primary function, and the context was not "business" in the sense of c. 93A. By contrast, the handling of claims is Risk Management's primary function, and there is no government entity on the present scene. And in *Poznik* v. *Massachusetts Med. Professional Ins. Assn.*, 417 Mass. 48, 51 (1994), the Association as a "legislatively created and controlled entity" with a special function was outside the range of c. 93A and c. 176D because it was not operating in a "business" context. See also *Barrett* v. *Massachusetts Insurers Insolvency Fund*, 412 Mass. at 777 (fund's transactions "motivated by legislative mandate, not business or personal reasons").

4. *Relevance of c. 176D standards.* Among the judge's findings and rulings were references to Risk Management's failure to effectuate a fair settlement of the Millers' claims and its refusal to pay the claims without conducting a reasonable investigation. As similar language appears in c. 176D, § 3(9)(*d*) and (*f*),[10] Risk Management is prompted to

---

[9]Quite anomalous is the suggestion that Risk Management, as a "charity," need not respond to a c. 93A judgment in tort beyond the $20,000 limit of G. L. c. 231, § 85K. The section, as inserted by St. 1971, c. 785, § 1, provides in part: "[I]f the tort was committed in the course of any activity carried on to accomplish directly the charitable purposes of such corporation, trust, or association, liability in any such cause of action shall not exceed the sum of twenty thousand dollars exclusive of interest and costs. . . . "

[10]General Laws c. 176D, § 3, as inserted by St. 1972, c. 543, § 1, provides in part:

"(9) Unfair claim settlement practices: An unfair claim settlement practice shall consist of any of the following acts or omissions:

. . .

"(d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

. . .

"(f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; . . . ."

418 36 Mass. App. Ct. 411

Miller v. Risk Management Foundation of the Harvard Medical Institutions, Inc.

argue that if, because it is a noninsurer, no direct action can be brought against it under the special provision of c. 93A, § 9, which authorizes an action against an insurance company that violates c. 176D, § 3(9),[11] there must be some mistake in using against it, in this ordinary c. 93A, § 9, action, standards drawn from c. 176D, § 3(9).

The argument is perverse. Risk Management, as claims negotiator and potential settler, has been interposed between the insurer CRICO and the claimant, and nothing seems more appropriate than to apply to it the standards of fair dealing expressed in c. 176D, § 3(9). This reference, moreover, is consistent with the broad policy of the courts, in defining what is or is not unfair or deceptive for purposes of c. 93A, to go for fruitful analogy to standards established by cognate statutes, common law rules, or other sources. See *Chamberlayne Sch. and Chamberlayne Jr. College* v. *Banker*, 30 Mass. App. Ct. 346, 353 (1991).[12]

Although we think the judge did well to look to the standards of c. 176D to aid her in interpreting c. 93A, we think she would have reached the same conclusion if she had disregarded c. 176D and adopted the commonplace ethical view that a claims facilitator ought not wear out the claimant by unduly delaying settlement when liability is clear. Indeed, in the course of her findings and conclusions she appears to subscribe to this view apart from her reference to the criteria of c. 176D.

5. *Conclusions on Risk Management's violations.* Upon analysis, the judge summed up and found the following. Risk

---

[11]General Laws c. 93A, § 9(1), as appearing in St. 1979, c. 406, § 1, provides in part: "[A]ny person whose rights are affected by another person violating the provisions of clause (9) of section three of chapter one hundred and seventy-six D may bring an action in the superior court . . . whether by way of original complaint, counterclaim, cross-claim or third party action, for damages and such equitable relief, including an injunction as the court deems to be necessary and proper. . . ."

[12]It is noteworthy that before the enactment of St. 1979, c. 406, § 1, amending c. 93A, § 9, expressly to allow an action against an insurer for violation of c. 176D, § 3(9), such an action was approved to go forward under the general language of c. 93A, § 9. See *Noyes* v. *Quincy Mut. Fire Ins. Co.*, 7 Mass. App. Ct. 723, 726 (1979).

Management, on notice of the accident in April, 1983, understood by July, 1983, that the malpractice claim (at least as to the hospital) was "one of reasonably clear liability." The company did not respond for six months to the Millers' first demand letter of June, 1984. Its first offer of settlement in April, 1985 (of $20,000 total) came two years after notice of the accident, nineteen months after liability was reasonably clear, and five months after the c. 93A demand. Meanwhile, except for a visit to the Millers' home some seventeen months after notice, there was virtually no investigation of the facts in the field. Of the offer of settlement, the judge said: "Given the probability of liability, the nature and extent of Miller's injury, and Miller's pain and suffering, the offer of $20,000 was not reasonable. At a minimum, Risk Management should have offered $40,000 to the plaintiffs: $20,000 to Malcolm Miller and $20,000 to Mary Miller, in July of 1983 when it had an obligation to effect a prompt, fair and equitable settlement in relation to the facts it had in its possession at that time." Thus the company "failed to fulfill its duty to act in good faith to settle this claim."

Risk Management argues that no more was proved against it than negligence and that liability under c. 93A looks to greater fault than that, see *MacGillivary* v. *W. Dana Bartlett Ins. Agency of Lexington, Inc.*, 14 Mass. App. Ct. 52, 59 (1982). We think the judge was warranted in thinking that the company's studied indifference to the claims sank below the negligence level. On the present record the judge could well conclude not only that the company was in violation of § 2 for commission of an unfair act or practice, and thus responsible for damages under § 9(1), see *Maillet* v. *ATF-Davidson Co.*, 407 Mass. 185, 189-194 (1990), but also that the company offended against § 9(3)[13] by withholding relief from the claimants in bad faith with knowledge or reason to

[13]General Laws c. 93A, § 9(3), as inserted by St. 1969, c. 690, provides in part: "[I]f the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon de-

know of its § 2 violation, and so furnished ground for the judge's trebling the damages found.[14] See *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 627 (1978); *DiMarzo* v. *American Mut. Ins. Co.*, 389 Mass. 85, 97 (1983).

6. *Analysis and revision of recoveries.* a. *Damages for delay.* As the judge held that the $40,000 was wrongfully withheld from the Millers, she proceeded to award interest on that sum for the period of such withholding, that is, from the time Risk Management knew or in reason should have known that the hospital was plainly at fault, July, 1983, to the date of the judgment in the malpractice action, July, 1986.[15] There are difficulties. Prejudgment interest (at twelve percent) allowed in the malpractice action ran from the time of the commencement of that action, November, 1984, to the date of judgment, July, 1986. This was in effect a charge for withholding the $40,000 found to be due. So, to avoid double payment, the prejudgment interest actually paid in the malpractice action should be deducted from the treble-interest amount calculated in the c. 93A action, to determine the amount to be awarded.

---

mand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two."

[14]Regarding the hospital's liability, Risk Management contends that the $20,000 limit of G. L. c. 231, § 85K, should engross both Millers' claims arising from the same incident. The point was not raised in the malpractice action. It is without merit. The statute speaks of $20,000 per "cause of action" (see note 9 *supra*), and for the present purpose we may accept the characterization of the consortium claim as an "independent tort" against the spouse, see *Bilodeau* v. *Lumbermens Mut. Cas. Co.*, 392 Mass. 537, 544 (1984).

[15]Section 9(3) of c. 93A was amended by St. 1989, c. 580, § 1, to include the following: "For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim." The amendment has been held to have only prospective application, see *Greelish* v. *Drew*, 35 Mass. App. Ct. 541, 543-545 (1993), thus we are not called upon to interpret it here. We venture the observation, however, that it can be read to require an award in a situation like the present of the full $40,000, which could then be trebled.

36 Mass. App. Ct. 411                                    421

Miller v. Risk Management Foundation of the Harvard Medical Institutions, Inc.

b. *Expense of trying the malpractice action.* The judge concluded that attorney's fees for the work done on the Millers' behalf in the malpractice action should be allowed in the present c. 93A suit. The judge applied the customary factors in determining reasonable fees — hours spent, reasonable hourly rates, success or failure, and so forth — and in that complex the figures she reached could be justified as within the range of her sound discretion.

Again there were difficulties. Chapter 93A, § 9(4), as inserted by St. 1969, c. 690, authorizes the award of legal fees "incurred in connection with said action" (i.e., the action under c. 93A), but not for other actions. See *Hanner v. Classic Auto Body, Inc.,* 10 Mass. App. Ct. 121, 123-124 (1980).[16]

The judge's award could be read differently. The judge found that Risk Management's protracted delay compelled the Millers to commence the malpractice action; therefore the expense of that action was a "foreseeable consequence[ ] of the defendant's unfair or deceptive act or practice" recoverable under c. 93A. *DiMarzo v. American Mut. Ins. Co.,* 389 Mass. at 101. However, the Millers retained the attorney on a contingency fee basis, with the Millers obliged to pay the attorney one third of the "gross amount collected" (whether by settlement or litigation) and "reasonable expenses and disbursements." Thus the additional expense to the Millers of having to litigate the malpractice and loss of consortium claims, rather than receiving an early settlement, was only in the way of expenses and disbursements occasioned by the litigation (and some of these may have been offset by the allowance of costs in the malpractice judgment).

---

[16]Where attorney's fees are authorized by statute and the purpose is to encourage the litigation of the particular claims, there may be ground for disregarding contingency fee arrangements between plaintiff and attorney and awarding full fees. See *Blanchard v Bergeron,* 489 U.S. 87 (1989) (civil rights action under 42 U.S.C. § 1983). This policy can extend to actions under c. 93A itself, see *Computer Sys. Engr., Inc. v. Qantel Corp.,* 571 F. Supp. 1379, 1381-1382 (D. Mass. 1983), aff'd, 740 F.2d 59 (1st Cir. 1984). But the policy hardly extends to an award of fees in the malpractice action herein.

c. *Attorney's fees in c. 93A action proper.* When the
c. 93A action was filed, the malpractice action had not yet
gone to trial, and, besides the hospital, the doctor and nurse
were plausible if not sure targets of the charge of malprac-
tice, with a chance of large recovery against them, not inhib-
ited by G. L. c. 231, § 85K, limiting recovery against the
hospital. A jury in the malpractice case then exonerated the
doctor and nurse of negligence. Nevertheless, the Millers in
the eventual trial of the c. 93A action pressed a contention
against Risk Management which would entail proof that the
company knew or had reason to know at an early stage that
the individuals had clearly been negligent and therefore a
reasonable settlement should have been offered to the Millers
taking this assumed negligence into account. The plaintiffs
persist in this contention and their cross appeal challenges its
final rejection by the trial judge.[17]

In considering attorney's fees, the judge took note of the
plaintiffs' failure on their contention that Risk Management
was an insurer covered by c. 176D. Also to be considered was
the proposition that a c. 93A claim against Risk Manage-
ment related to the doctor and nurse was unrealistic and its
pursuit rather quixotic. Thus we have a c. 93A action
mounted by the attorneys which in a practical view could be
expected to yield at most damages for delay in offering a set-
tlement of $40,000 along with the remaining uncompensated
expenses and disbursements of the malpractice action. While
the maintenance of a c. 93A action need not be questioned,
on the fee question there was reason to consider — the judge
did not do so, at least expressly — that a part of the case
was without much promise. At the same time it should be
noted that Risk Management put formidable obstacles in the
way of any recovery.

---

[17]On the cross appeal, the Millers say Risk Management should have
offered $140,000 in settlement, but this assumes that malpractice liability
was plain on the part of the doctor and nurse. The judge below did not err
in holding that liability was clear only as to the hospital. So also, the Mill-
ers' argument is belied by the negative result of the malpractice action as
against the individuals.

The judgments are affirmed, except that the matters mentioned in 6a, b, and c of the opinion are remanded for recomputation or reconsideration. As to these matters the judge may, in her discretion, receive additional evidence and argument.

*So ordered.*